UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 22-cr-00406 (RBW) |
| v. : | |
| : | |
| VINCENT ARDOLINO, : | |
| : | |
| Defendant : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Vincent Ardolino to 45 days' incarceration and $500 restitution.

**I.     Introduction**

Defendant Vincent Ardolino, 45, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Ardolino pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 45 days' incarceration is appropriate in this case because Ardolino: (1) entered a sensitive area of the Capitol, namely the Senate Spouses' Lobby; (2) called police officers

---

[1] Although the Statement of Offense in this matter reflects a sum of more than $1.4 million dollars for repairs, *see* Statement of Offense p. 3, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

"traitors" and took multiple photographs of them protecting the Capitol, demonstrating a failure to appreciate the impact of the events surrounding him; (3) when interviewed at his home, repeatedly lied to the FBI about his participation in the riot; (4) was still on probation on January 6 for a conviction of driving under the influence; (5) had other prior criminal history for driving on a suspended license; and (6) has demonstrated no remorse, instead doubling down on false theories.

The Court must also consider that Ardolino's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Ardolino's crime support a sentence of 45 days' incarceration and $500 restitution in this case.

## II.   Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense, at 1-3.

*Defendant Ardolino's Role in the January 6, 2021 Attack on the Capitol*

On December 19, 2020, Ardolino sent a text message to an associate stating, "Trump announced a major event in DC on the 6th. I'm thinking about going . . . You wanna go?" Ardolino continued, "That's the day that Congress accepts or rejects the electors and there will be a battle when America realizes Trump will be serving 4 more years." Three days later, Ardolino told this same person, "Trump said be there January 6, its gonna be wild."

On December 26, 2020, Ardolino sent a text message to another associate stating, "We all see what's happening. The attempted takeover of our country. I've never been to DC before but when President Trump said to be in DC on the 6th, I couldn't stand by and not answer the call.

That is a key date pivotal to America's future and DC will be the epicenter." On December 28, 2021, Ardolino continued, "I'm getting the impression that we are their to make sure the radicals don't storm the Whitehouse in an effort to physically remove the President. Once they realize he will not accept a stolen election under any circumstances they have made plans to shutdown DC. They can't implement their plans if their are thousands of supporters everywhere." On January 4, 2021, Ardolino flew to Washington, D.C. to, in his words, "fight the political corruption that has infected our Government."

At approximately 3:16 p.m. on January 6, 2021, Ardolino entered the U.S. Capitol building at the Senate Wing Door, which rioters breached an hour earlier by breaking down the door and the adjacent windows. Gov't Ex. 1 at 5:44-6:20.



*Image 1: Ardolino's entry into the U.S. Capitol on January 6, 2021*

Once inside the U.S. Capitol, Ardolino entered the Senate Spouses' Lobby, a private meeting space.² While there, he took a photograph of a large line of police officers on the Upper West Terrace of the Capitol.



*Image 2: View of the Upper West Terrace from the Senate Spouses' Lobby as captured by Ardolino*

After leaving the Senate Spouses' Lobby, Ardolino continued onto the Crypt. As he entered, he held his phone high above his head in an apparent attempt to film what was going on. Gov't Ex. 4 at 0:57-1:14.

---

² Formerly known as the "Senate Wives' Lounge," this room in the U.S. Capitol has historically served as a private meeting space for the spouses of Senators to plan events that transcend bipartisan politics.



*Image 3: Ardolino walking through the Crypt with his cell phone above his head*

After spending a few minutes in the Crypt, Ardolino returned to the Senate Wing Door. He lingered in the Senate Wing Door lobby area for five minutes, despite the significant police presence, and took more photographs of the scene. He exited the Capitol Building at approximately 3:26 p.m. Gov't Ex. 2 at 1:25-6:29.



*Image 4: Ardolino departing the Senate Wing Door with police officers in the foreground*

After leaving the Capitol Building, Ardolino filmed a group of officers arriving on the U.S. Capitol grounds, and called them "traitors" and other obscenities. Gov't Ex. 3. Ardolino also texted an associate "I was their. I went in the capital . . . ." Finally, at some point during the day, Ardolino posed for a selfie-style photo in front of a line of officers defendant the Capitol.



*Image 5: Ardolino standing in front of a line of Metropolitan Police Department officers*

*Social Media Posts*

Ardolino maintained a Twitter account with the username @NMTNMS, and he used this account to post his opinions about the 2020 presidential election and about the riot on January 6, 2021, including false information and calls for violence. Hours after the riot, Ardolino posted "#cspan you people are clueless. The COUP is the Democrats who rigged this election.  No transparency whatsoever." Minutes later, he posted "#cspan I was on the grounds today. Was teargassed with women and children around. This is TYRANNY." On January 8, 2021, he tweeted at Representative Lauren Boebert, "I see civil war coming." The next day, he tweeted "Trump did win. Until they rigged it. Time for Trump supporters to get violent." On June 30, 2021, he

6

retweeted another user, who said "Trump won and January 6th was a set up." On July 14, 2021, Ardolino posted "There was no insurrection. What there was is a coup d'état. A coup d'état or coup is the removal and seizure of a government and its powers. Typically, it is an illegal, unconstitutional seizure of power by a political faction, the military, or a dictator."

*Defendant's Interview*

On February 19, 2022, Ardolino participated voluntarily in a 40-minute long interview at his home with the Federal Bureau of Investigation. During the interview, Ardolino lied repeatedly. He initially denied being present at the Capitol on January 6, first telling agents that he only went to President Trump's rally and then returned to his hotel. When asked if he went anywhere else for the rest of the day, Ardolino said "Well, I went to get food." When shown a photograph of himself standing in front of police officers outside of the Capitol, Ardolino's story changed.

When asked to confirm that he appeared in a photograph, Ardolino demurred. He then admitted that he went to the Capitol after the rally, but minimized his conduct, telling agents he was "just following the crowd." When shown still images of surveillance footage from the Senate Wing Door, Ardolino finally conceded that he went inside the Capitol. Towards the end of the interview, despite his own participation in the riot, Ardolino said that January 6 "was all staged."

*The Charges and Plea Agreement*

On November 21, 2022, the United States charged Ardolino by criminal complaint with violating 18 U.S.C. § 1752(a)(1)-(2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On December 1, 2022, law enforcement officers arrested him at his home in Huntington Beach, California. On December 15, 2022, the United States charged Ardolino by a four-count Information with violating 18 U.S.C. § 1752(a)(1)-(2), and 40 U.S.C. § 5104(e)(2)(D) and (G). On May 18, 2023, pursuant to a plea agreement, Ardolino will plead guilty to Count Four of the Information, charging him

7

with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III. Statutory Penalties

Ardolino now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement, Ardolino faces up to six months of imprisonment and a fine of up to $5,000. Ardolino must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 45 days' incarceration and $500 restitution.

#### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Ardolino's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Ardolino, the absence of violent or destructive acts is not a mitigating factor. Had Ardolino engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Ardolino's case is that he lied to the FBI about his involvement in the January 6 riot. During a 40-minute interview, Ardolino changed his story multiple times, and repeatedly denied entering the U.S. Capitol building. He only finally admitted to entering the U.S. Capitol building after being shown an image of himself walking through the breached Senate Wing Door.

Ardolino's conduct on January 6 also demonstrated a glib indifference to the gravity of what happened that day. As both surveillance videos and media recovered from Ardolino show, Ardolino spent his time at the Capitol taking multiple photographs and videos. In one photograph, he captured a selfie of himself standing in front of a line of police officers, suggesting that he either thought it was a souvenir-worthy moment Inside the Capitol, Ardolino constantly filmed what was happening in front of him, including outnumbered police officers who were being overwhelmed by the mob. *See e.g.*, Gov't Ex. 2 at 3:42. The fact that Ardolino entered a sensitive, more private area of the Capitol (the Senate Spouses' Lobby) is also aggravating, showing that his breach of the Capitol was more involved than others'.

### B. The History and Characteristics of Ardolino

Ardolino's crimes on January 6 were not an isolated event in an otherwise spotless record. Ardolino's criminal history includes a misdemeanor conviction for Operating a Vehicle while Under the Influence (Alcohol and/or Drugs). PSR ⁋ 32-38. He was convicted on October 3, 2019 and sentenced to three years' probation. PSR ⁋ 36. Thus, when Ardolino traveled to Washington, D.C. and participated in the attack on the Capitol, he was still under the supervision of a California court for the DUI conviction.

Ardolino had prior experience being on probation and must have known that he was not permitted to engage in additional criminal offenses while on probation. In 2005 and 2007, Ardolino

was placed on probation for three years for driving on a suspended license. PSR ¶ 33-34. In the 2005 case, he was also sentenced to 15 days' incarceration. While these convictions are relatively minor offenses, they do provide insight into Ardolino's familiarity with the criminal justice system.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

From the information that is available regarding Ardolino, it is clear that there is a need for specific deterrence given his history of recidivism. As noted above, in 2005, Ardolino received a sentence of 14 days' incarceration and 3 years' probation for driving on a suspended license. However, before he completed that probation period, he was convicted again for the same offense in 2007. And in the present case, Ardolino was still on probation for his 2019 DUI conviction, but he nonetheless decided to enter the U.S. Capitol on January 6, despite all signs that he was not permitted to be there.

11

Ardolino has not expressed remorse for his actions on January 6. The government is not aware of any statement of remorse when Ardolino was interviewed by law enforcement or during the time preceding the sentencing hearing. To the contrary, Ardolino doubled down on his theories on social media, failing to take responsibility and blaming others for the events of January 6, calling it "staged" and a "set up."

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Ardolino based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Ardolino pleaded guilty to Count Four of the Superseding Information, charging him with parading, demonstrating, or picketing, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

12

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those

13

cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For

14

that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Andrew Galloway*, 22-cr-12 (CRC), the defendant lied to the FBI by initially telling the agents that he had not entered the Capitol Building. Gov. Sent. Mem., 22-cr-12 (CRC), ECF No. 31, at 7 (D.D.C. filed October 6, 2022). To support his claim, Galloway showed the agents photographs on his phone to purportedly corroborate that he did not enter the Capitol.

15

*Id.* Similar to Ardolino's claim that January 6 was a "setup," Galloway also asserted that the agitators at the Capitol were members of Antifa. *Id.* One distinction in these two cases is that unlike Ardolino, Galloway had no criminal record prior to January 6. The Court sentenced Galloway to 30 days' incarceration, $1,000 fine, and $500 restitution.

In *United States v. Tam Pham*, 21-cr-109 (TJK), the defendant spent 20 minutes in the Capitol. Upon entry, he chanted "we are taking the House back." He then made his way to the office suite of House Minority Leader Kevin McCarthy. At the time of the riot, Pham had been a police officer in Houston, Texas for 18 years. After January 6, Pham lied to the FBI when he said that he only wanted to go into the Capitol to take pictures of art. For his plea to violating 40 U.S.C. § 5104(e)(2)(G), the court sentenced Pham to 45 days' incarceration.

In *United States v. Matthew Buckler*, 22-cr-162 (TNM), Buckler climbed through one of the broken Senate Wing Door windows, entered Senator Jeff Merkley's office and chanted after seeing the destruction inside. Gov. Sent. Mem., 22-cr-162 (TNM), ECF No. 26, at 2 (D.D.C. filed July 14, 2022). Buckler also took a selfie-style video of himself standing in the Crypt to celebrate the riot. *Id.* When interviewed by the FBI, Buckler lied, and said that he had freely walked into the Capitol. *Id.* at p. 10.  *Id.* At the time of the riot, Buckler was an 18-year-old high school senior with no criminal history. Ardolino is over twice Buckler's age and has multiple prior sentences, including incarceration and probation. The Court sentenced Buckler to 14 days' home confinement, 24 months' probation, 60 hours' community service, and $500 restitution.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[4]

## V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea

---

[4] As a result of the D.C. Circuit's decision in *United States v. James Little*, 22-3018 (D.C. Cir. Aug. 18, 2023), the government is not permitted to ask for a split-sentence as we have previously. We are currently evaluating our options, and the implications of *Little*. But given the timing of this sentencing, we believe our allocution is just and appropriate.

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Ardolino must pay $500 in restitution, which reflects in part the role Ardolino played in the riot on January 6.[6] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Ardolino's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.

## VI. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 45 days' incarceration and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

---

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

                                                Respectfully submitted,

                                                MATTHEW M. GRAVES  
                                                United States Attorney  
                                                D.C. Bar No. 481052

By:     _s/ *Andrew Haag*_  
            Andrew S. Haag  
            Assistant United States Attorney  
            MA Bar No. 705425  
            601 D Street N.W.  
            Washington, D.C. 20530

**CERTIFICATE OF SERVICE**

On this 13th day of September 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 s/ *Andrew Haag*
Andrew S. Haag
Assistant United States Attorney
MA Bar No. 705425
601 D Street N.W.
Washington, D.C. 20530